**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **ERICA LAVON CLARK,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 3:21-cv-00635** |
| ) | |
| **TRANS UNION, LLC,** ) | |
| **SERVE:  Corporation Service Company, Reg. Agent** ) | |
| **100 Shockoe Slip** ) | |
| **2ⁿᵈ Floor** ) | |
| **Richmond, VA 23219** ) | |
| ) | |
| **and** ) | |
| ) | |
| **PEOPLES ADVANTAGE FEDERAL CREDIT UNION,** ) | |
| **SERVE:  Patsy Smith, President and CEO** ) | |
| **110 Wagner Road** ) | |
| **Petersburg, VA 23805** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

COMES NOW the Plaintiff, ERICA LAVON CLARK, by counsel, and for her complaint against each of the Defendants, alleges as follows:

### I.

#### PRELIMINARY STATEMENT

1.      Defendants TRANS UNION, LLC, and PEOPLES ADVANTAGE FEDERAL CREDIT UNION have violated the Fair Credit Reporting Act, 15 U.S.C. §§ 1681a–x ("FCRA") by improperly continuing to report derogatory information on Plaintiff's credit file regarding a debt that was discharged in Plaintiff's bankruptcy case more than seven years after the date Plaintiff filed her bankruptcy petition and more than seven years after the account first became

delinquent. Despite receiving multiple disputes and correspondence from Plaintiff, Defendants continued to report this derogatory information on Plaintiff's credit.

2.     Defendants' violations include: generating and publishing consumer reports regarding Plaintiff which contained negative information that predated those reports by more than seven years (i.e., reporting obsolete information regarding Plaintiff), failing to maintain reasonable procedures to prevent the reporting of obsolete adverse information regarding Plaintiff, failing to properly investigate Plaintiff's disputes, and failing to maintain reasonable procedures to assure maximum possible accuracy of the information in Plaintiff's credit files. Through these failures, and by improperly reporting on Plaintiff's credit, Defendants violated, repeatedly and over an extended period of time, Plaintiff's rights under the FCRA. Accordingly, Plaintiff seeks actual damages, attorney's fees and costs, and punitive damages for Defendants' willful violations of the FCRA.

## II.

### JURISDICTION AND VENUE

3.     The jurisdiction of this Court is conferred by 15 U.S.C. §1681(p) and 28 U.S.C. §1331.

4.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(1)-(2).

## III.

### PARTIES

5.     Plaintiff ERICA LAVON CLARK ("Ms. Clark" or "Plaintiff") is a natural person and "consumer" as defined by § 1681a(c) of the FCRA. Ms. Clark resides in the County of Chesterfield, Virginia, which falls within the Richmond Division of the Eastern District of Virginia.

6.    Defendant TRANS UNION, LLC ("Trans Union") is a limited liability company formed in Delaware and authorized to do business in the Commonwealth of Virginia through its registered offices in Richmond, Virginia.

7.    Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing to third parties information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d).

8.    Trans Union disburses consumer reports to third parties, under contract, for monetary compensation.

9.    Defendant PEOPLES ADVANTAGE FEDERAL CREDIT UNION ("PAFCU") is a federally-chartered credit union, with its headquarters located in Petersburg, Virginia. PAFCU conducts business in the Commonwealth of Virginia, with consumers in Virginia.

10.    With respect to the account it reported on Plaintiff's credit, PAFCU is a "furnisher" as governed by the FCRA.

**IV.**

**FACTS**

**A.    Background**

11.    On or about May 15, 2008, Plaintiff executed a LOANLINER Open-End Credit and Security Agreement Plan with Resources Federal Credit Union ("Resources FCU"), the terms of which governed the terms of future anticipated loans Resources FCU might advance to Plaintiff, referred to therein as "subaccounts" (the "LOANLINER Plan").

12.    On or about October 27, 2008, Plaintiff executed a LOANLINER Open-End Disbursement Receipt with Resources FCU, which established a subaccount under the

LOANLINER Plan in the form of a personal installment loan with a principal balance owed in the amount of $8,218.88 (the "Installment Loan").

13.     Upon information and belief, in or around April 2012, Plaintiff became delinquent in making the monthly payments due to Resources FCU under the terms of the Installment Loan. Payments on the Installment Loan remained delinquent through the date that Plaintiff filed her bankruptcy petition, and the delinquency on the account was not cured at any time after April 2012.

14.     On September 4, 2012, Plaintiff filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code in the Eastern District of Virginia, Richmond Division, Case No. 12-35173-KLP. Relief was ordered.

15.     At the time of the bankruptcy filing, the Installment Loan was open, and the payments remained delinquent.

16.     Amongst the debts included in her bankruptcy schedules filed with the bankruptcy court on September 4, 2012, Plaintiff listed the Installment Loan owed to Resources FCU in "Schedule F–Creditors Holding Unsecured Nonpriority Claims".

17.     On September 6, 2012, Resources FCU, by counsel, filed in Plaintiff's bankruptcy case a proof of claim, which the court designated as Claim no. 1-1, asserting an unsecured claim in the amount of $4,025.67 based on the balance due on the Installment Loan.

18.     On September 14, 2012, Resources FCU filed in Plaintiff's bankruptcy case a second proof of claim, which the court designated as Claim no. 3-1, asserting an unsecured claim in the amount of $3,143.49, which was also based on the balance due on the Installment Loan. Resources FCU subsequently withdrew Claim no. 3-1 on February 25, 2013.

19.     On September 5, 2012, Plaintiff filed in her bankruptcy case a Chapter 13 Plan and Related Motions (the "First Plan").  The bankruptcy court confirmed the First Plan on November 13, 2012.

20.     On October 8, 2013, Plaintiff filed in her bankruptcy case a Modified Chapter 13 Plan and Related Motions (the "Amended Plan"), the terms of which treated the Resources FCU Installment Loan as a non-priority unsecured claim to be paid pro rata from any distribution remaining after disbursement to the holders of allowed secured and priority claims. The Amended Plan estimated that nonpriority unsecured creditors would receive a 25% dividend on amounts they claimed in the bankruptcy, with the remaining amount of the unsecured debts to be discharged.

21.     On or about October 8, 2013, Plaintiff served a copy of the Amended plan on all creditors and parties in interest, including Resources FCU.

22.     On November 7, 2013, without objection from any creditor or the trustee of Plaintiff's Chapter 13 bankruptcy estate (the "Trustee"), the bankruptcy court entered an order confirming the Amended Plan.

23.     In or around May 2014, Resources FCU merged with and into PAFCU. PAFCU, as the successor-in-interest to Resources FCU, took over the servicing of Plaintiff's Installment Loan.

24.     On January 30, 2018, the Trustee filed a report with the court, confirming that Plaintiff had completed all payments required under the Amended Plan. The Trustee's report also confirmed that she disbursed $1,236.34—a dividend of approximately 30.71%—to Resources FCU to satisfy the claim based on the Installment Loan.

25.     On December 5, 2017, the bankruptcy court entered a Discharge of Debtor in Plaintiff's bankruptcy case, pursuant to 11 U.S.C. § 727 of the Bankruptcy Code (the "Discharge").

26.     The Installment Loan was included in Plaintiff's Discharge.

27.     After receiving her Discharge, Plaintiff hoped and believed her credit problems were behind her and that, based on her faithful completion of all of her obligations to obtain her Discharge, she would be allowed to receive a fresh start from her indebtedness and rebuild her credit.

**B.      Inaccurate and Derogatory Reporting by Trans Union.**

28.     In or around July 2019, almost seven years after filing her bankruptcy case and more than seven years after the date the Installment Loan first became delinquent, Plaintiff submitted a credit application to Sallie Mae Bank, seeking financing to assist her daughter in paying for tuition and other school-related expenses associated with attending college. The credit transaction did not involve a principal amount of $150,000.00 or more.

29.     Upon information and belief, on July 10, 2019 and July 17, 2019, in connection with Plaintiff's credit application, Trans Union furnished to Sallie Mae Bank consumer reports concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account.

30.     In or around August 2019, Plaintiff requested a copy of her credit disclosure from Trans Union. Plaintiff subsequently obtained a credit disclosure from Trans Union dated August 19, 2019 (the "2019 Disclosure").

31.     The 2019 Disclosure revealed that Trans Union was inaccurately reporting derogatory information about the Installment Loan account. Specifically, Trans Union was

reporting an account status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy". Additionally, Trans Union was reporting an indication that the derogatory information about the Installment Loan account would continue to be reported on Plaintiff's credit until July 2021. Notably, Trans Union was not reporting any references to the date of first delinquency of the Installment Loan account.

32.     Trans Union's reporting of derogatory information regarding the Installment Loan account was inaccurate because that information was obsolete due to the fact that the date of first delinquency of the Installment Loan was in April 2012, which antedated the date of the 2019 Disclosure by more than seven years. Therefore, any derogatory information being reported about the Installment Loan should have been excluded from Plaintiff's consumer report. Furthermore, Trans Union's omission of the date of first delinquency of the Installment Loan account was misleading because it created the impression that the derogatory information being reported was not obsolete. Finally, it was inaccurate for Trans Union to report an indication that derogatory information regarding the Installment Loan account would continue to be reported on Plaintiff's credit until July 2021, because that date was well beyond the seven-year period after both the date of first delinquency on the account and the date of Plaintiff's bankruptcy petition.

33.     On or about August 19, 2019, Plaintiff submitted an online dispute to Trans Union, requesting that derogatory information regarding the Installment Loan account be deleted from Plaintiff's credit file.

34.     After receiving Plaintiff's online dispute, Trans Union did not delete or correct the derogatory information regarding the Installment Loan being reported on Plaintiff's credit file.

**C.**     **Plaintiff's First Dispute Letter to Trans Union.**

35.     On or about September 30, 2019, Plaintiff sent Trans Union a letter, dated September 30, 2019, via certified mail, to dispute the inaccurate and derogatory information set forth in the 2019 Disclosure (the "First Dispute Letter").

36.     Plaintiff paid to the United States Postal Service the costs associated with mailing the First Dispute Letter via certified mail.

37.     In the First Dispute Letter, Plaintiff advised Trans Union that the Installment Loan was discharged in her bankruptcy case filed in September 2012, she disputed Trans Union's reporting of derogatory information regarding the Installment Loan account more than seven years after the date of first delinquency, and she requested it be deleted from her credit file.

38.     On October 4, 2019, Trans Union received Plaintiff's First Dispute Letter.

39.     In response to the First Dispute Letter, Trans Union mailed to Plaintiff its reinvestigation results, dated October 17, 2019.

40.     In its October 17, 2019 reinvestigation results, Trans Union advised Plaintiff that it "verified as accurate" the information being reported about the Installment Loan account. As a result, Trans Union continued to report a derogatory account status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy" regarding the Installment Loan account. The trade line also continued to reflect that the derogatory information regarding the Installment Loan would be reported until July 2021, and it omitted any reference to the date of first delinquency of the Installment Loan.

**D.      Plaintiff's Second Dispute Letter to Trans Union.**

41.      On or about November 26, 2019, Plaintiff sent Trans Union a second letter, dated November 22, 2019, via certified mail, to dispute the inaccurate and derogatory information being reported on her credit (the "Second Dispute Letter").

42.      Plaintiff paid to the United States Postal Service the costs associated with mailing the Second Dispute Letter via certified mail.

43.      In the Second Dispute Letter, Plaintiff again disputed the derogatory information Trans Union was reporting regarding the Installment Loan. Specifically, Plaintiff advised Trans Union that the Installment Loan was discharged in her bankruptcy case filed in September 2012, and she disputed Trans Union's reporting of derogatory information regarding the Installment Loan account more than seven years after the date of first delinquency.

44.      Plaintiff enclosed with the Second Dispute Letter copies of her current driver's license and signed social security card to verify her identity. Plaintiff also enclosed her relevant bankruptcy schedules and her Discharge paperwork to demonstrate that the Installment Loan was included and discharged in her bankruptcy. Plaintiff requested again that Trans Union delete the derogatory information it was reporting about the Installment Loan.

45.      On December 2, 2019, Trans Union received Plaintiff's Second Dispute Letter.

46.      In response to the Second Dispute Letter, Trans Union mailed to Plaintiff's address two letters, each dated December 3, 2019.

47.      Even though Trans Union sent its December 3, 2019 letters to Plaintiff's address, each letter was addressed to a third party, "Caridad Bosmenier," who is unknown to Plaintiff.

48.      In its first December 3, 2019 letter, addressed to Caridad Bosmenier at Plaintiff's address, Trans Union indicated that the proof of mailing address that Plaintiff enclosed with her

Second Dispute Letter, a current driver's license that included her current mailing address, was unacceptable. As a result, Trans Union requested additional documentation from Plaintiff to verify her mailing address.

49.     In its second December 3, 2019 letter, also addressed to Caridad Bosmenier at Plaintiff's address, Trans Union indicated that the information Plaintiff disputed in her Second Dispute Letter "does not appear on [her] Trans Union credit report."

50.     Because Trans Union's December 3, 2019 letters were addressed to an unknown third party, Plaintiff was unaware as to whether Trans Union deleted or otherwise addressed Plaintiff's dispute regarding the Installment Loan account.

51.     In or around December 2019, Plaintiff submitted another credit application to Sallie Mae Bank, again seeking financing to assist her daughter in paying for tuition and other school-related expenses associated with attending college. The credit transaction did not involve a principal amount of $150,000.00 or more.

52.     Upon information and belief, on December 17, 2019 and December 22, 2019, in connection with Plaintiff's credit application, Trans Union furnished to Sallie Mae Bank consumer reports concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account. Plaintiff's application was denied. Upon information and belief, Sallie Mae Bank relied upon information contained in the consumer reports provided by Trans Union in making its decision to deny the extension of credit to Plaintiff.

**E.      Plaintiff's Third Dispute Letter to Trans Union.**

53.     On or about February 11, 2020, Plaintiff sent Trans Union a third letter, dated February 6, 2020, via certified mail, to dispute the inaccurate and derogatory information being reported on her credit (the "Third Dispute Letter").

54.     Plaintiff paid to the United States Postal Service the costs associated with mailing the Third Dispute Letter via certified mail.

55.     In the Third Dispute Letter, Plaintiff again disputed the derogatory information Trans Union was reporting regarding the Installment Loan. Specifically, Plaintiff advised Trans Union that the Installment Loan was discharged in her bankruptcy case filed in September 2012, and she disputed Trans Union's reporting of derogatory information regarding the Installment Loan account more than seven years after the date of first delinquency. Plaintiff also advised Trans Union that its December 3, 2019 letter sent in response to Plaintiff's Second Dispute Letter was addressed to an unknown third party, which suggested that Trans Union may have previously investigated the wrong person's credit file.

56.     Plaintiff enclosed with the Third Dispute Letter copies of her current driver's license and signed social security card to verify her identity. Plaintiff also enclosed a copy of the December 3, 2019 letter that Trans Union previously sent to Plaintiff's address but addressed to a different person. Finally, Plaintiff enclosed her relevant bankruptcy schedules and her Discharge paperwork to demonstrate that the Installment Loan was included and discharged in her bankruptcy. Plaintiff requested again that Trans Union delete the derogatory information it was reporting about the Installment Loan.

57.     On February 13, 2020, Trans Union received Plaintiff's Third Dispute Letter.

58.     In response to the Third Dispute Letter, Trans Union mailed to Plaintiff's address two letters, each dated February 14, 2020.

59.     Even though Trans Union sent its February 14, 2020 letters to Plaintiff's address, each letter was again addressed to "Caridad Bosmenier".

60.     In its first February 14, 2020 letter, addressed to Caridad Bosmenier at Plaintiff's address, Trans Union indicated that the proof of mailing address that Plaintiff enclosed with her Third Dispute Letter, a current driver's license that included her current mailing address, was unacceptable. As a result, Trans Union requested additional documentation from Plaintiff to verify her mailing address.

61.     In its second February 14, 2020 letter, also addressed to Caridad Bosmenier at Plaintiff's address, Trans Union indicated that it was unable to process Plaintiff's request in her Third Dispute Letter because Trans Union was "unable to determine the nature of [her] request or [her] request was illegible."

62.     Several weeks thereafter, Trans Union mailed to Plaintiff reinvestigation results, dated March 6, 2020.

63.     In its March 6, 2020 reinvestigation results, Trans Union failed again to correct the information that Plaintiff disputed with respect to the Installment Loan account. Instead, Trans Union advised Plaintiff that it "verified as accurate" the information being reported and, as a result, Trans Union continued to report a derogatory account status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy" regarding the Installment Loan account. The trade line also continued to reflect that the derogatory information regarding the Installment Loan would be reported until July 2021, and it omitted any reference to the date of first delinquency of the Installment Loan.

64.     In or around March 2020, Plaintiff approached Virginia Credit Union, located in Richmond, Virginia, seeking approval of a mortgage loan to refinance the mortgage loan encumbering her home. The credit transaction did not involve a principal amount of $150,000.00

or more. In connection with her request, Plaintiff submitted a credit application to Virginia Credit Union.

65. Upon information and belief, on or about March 2, 2020, in connection with Plaintiff's credit application, Trans Union furnished to Virginia Credit Union a consumer report concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account.

**F.     Plaintiff's Fourth Dispute Letter to Trans Union.**

66. On or about March 31, 2020, Plaintiff sent Trans Union a fourth letter, dated March 26, 2020, via certified mail, to dispute the inaccurate and derogatory information being reported on her credit (the "Fourth Dispute Letter").

67. Plaintiff paid to the United States Postal Service the costs associated with mailing the Fourth Dispute Letter via certified mail.

68. In the Fourth Dispute Letter, Plaintiff again disputed the derogatory information Trans Union was reporting regarding the Installment Loan. Specifically, Plaintiff advised Trans Union that the Installment Loan was discharged in her bankruptcy case filed in September 2012, and she disputed Trans Union's reporting of derogatory information regarding the Installment Loan account more than seven years after the date of first delinquency.

69. Plaintiff enclosed with the Fourth Dispute Letter copies of her current driver's license and signed social security card to verify her identity. Plaintiff also enclosed her relevant bankruptcy schedules, the proof of claim related to the Installment Loan that was filed in her bankruptcy case, and her Discharge paperwork to demonstrate that the Installment Loan was already delinquent at the time of the bankruptcy filing, and the debt was included and discharged

in her bankruptcy. Plaintiff requested again that Trans Union delete the derogatory information it was reporting about the Installment Loan.

70. On April 2, 2020, Trans Union received Plaintiff's Fourth Dispute Letter.

71. In response to the Fourth Dispute Letter, Trans Union mailed to Plaintiff its reinvestigation results, dated April 14, 2020.

72. In its April 14, 2020 reinvestigation results, Trans Union failed again to correct the information that Plaintiff disputed with respect to the Installment Loan account. Instead, Trans Union advised Plaintiff that it "verified as accurate" the information being reported and, as a result, Trans Union continued to report a derogatory account status of "Account Included in Bankruptcy" and remarks of "Chapter 13 Bankruptcy" regarding the Installment Loan account. The trade line also continued to reflect that the derogatory information regarding the Installment Loan would be reported until July 2021, and it omitted any reference to the date of first delinquency of the Installment Loan.

73. In or around September 2021, Plaintiff obtained an updated copy of her Trans Union credit disclosure, dated September 8, 2021, which revealed that sometime after sending its April 14, 2020 reinvestigation results to Plaintiff, Trans Union finally deleted from Plaintiff's credit file the derogatory information that Plaintiff disputed in her dispute letters regarding the Installment Loan.

74. Trans Union received an online dispute and four dispute letters from Plaintiff, but in each instance, it failed to conduct the reinvestigations required by law. Instead, Trans Union merely "parroted" inaccurate information dictated to it by PAFCU.

75. Trans Union had knowledge that it was reporting inaccurate and derogatory information about Plaintiff's Installment Loan account more than seven years after the date the

account first became delinquent and more than seven years after Plaintiff filed her bankruptcy petition, but it deliberately chose to ignore this knowledge, and instead chose to continue to report the derogatory information on Plaintiff's credit, along with an indication that the derogatory information would continue to be reported until July 2021 and no indication of the date of first delinquency of the Installment Loan.

76.     Upon information and belief, despite receiving each of Plaintiff's disputes, Trans Union continued to report on Plaintiff's credit file the derogatory information regarding the Installment Loan, with no indication of the date of first delinquency, until July 2021, as it indicated it would in the Installment Loan trade line set forth in the 2019 Disclosure, Trans Union's October 17, 2019 reinvestigation results, Trans Union's March 6, 2020 reinvestigation results, and Trans Union's April 14, 2020 reinvestigation results.

77.     Upon information and belief, Trans Union published to third parties multiple inaccurate consumer reports about Plaintiff that contained the inaccurate and derogatory information disputed by Plaintiff.

**G.      Failure to Correct Inaccurate and Derogatory Reporting by PAFCU**

78.     Upon information and belief, after receipt of the each of Plaintiff's letters disputing information about the Installment Loan, Trans Union forwarded Plaintiff's disputes to PAFCU.

79.     Upon information and belief, PAFCU utilized the e-OSCAR automated system ("e-OSCAR") and the use of Automated Consumer Dispute Verification ("ACDV") procedures to process Plaintiff's disputes.

80.    Upon information and belief, PAFCU was provided notice of all of Plaintiff's disputes to Trans Union and, despite receiving these notices, failed and refused to investigate and correct its inaccurate reporting.

81.    PAFCU was aware of the correct way to report the Installment Loan on Plaintiff's credit following the expiration of the seven-year period after the date of first delinquency and seven years after the date Plaintiff filed her bankruptcy case.

82.    Over twenty years ago, the Consumer Data Industry Association (the "CDIA") created a standardized, electronic format named "Metro 2," for furnishers of information (like PAFCU) to use in reporting to the Nationwide Consumer Reporting Agencies (the "CRA's," which includes Trans Union).[1] Furnishers receive training on how to properly implement the Metro 2 standards, which are laid out in the CDIA's Credit Reporting Resource Guide.

83.    According to the FCRA, 15 U.S.C. § 1681c(a)(5), and the standards in the Credit Reporting Resource Guide, PAFCU should have furnished to Trans Union an accurate date of first delinquency regarding the Installment Loan, and upon the expiration of the seven year period after the date the Installment Loan first became delinquent, PAFCU should have ceased reporting any delinquent data or derogatory information regarding the Installment Loan.[2]

84.    According to the FCRA, 15 U.S.C. § 1681c(a)(5), and the standards in the Credit Reporting Resource Guide, upon the expiration of the seven year period after the date of Plaintiff's bankruptcy petition, PAFCU should have again ceased reporting any delinquent data or derogatory information regarding the Installment Loan.[3]

---

[1] CFPB, KEY DIMENSIONS & PROCESSES IN THE U.S. CREDIT REPORTING SYSTEM (Dec. 2012), *available at* http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf.
[2] Consumer Data Industry Association, Credit Reporting Resource Guide 4-17, 5-35, and 5-36 (2018).
[3] *Id*.

85.     PAFCU chose to not report information on Plaintiff's credit according to the standards set forth in the FCRA and laid out in the Credit Reporting Resource Guide. Instead, PAFCU chose to report derogatory information on Plaintiff's credit regarding the Installment Loan more than seven years after the date the account first became delinquent and more than seven years after the filing of Plaintiff's bankruptcy petition even though the Installment loan was included and discharged in Plaintiff's bankruptcy case.

86.     Upon information and belief, PAFCU continued to furnish to Trans Union an inaccurate date of first delinquency related to the Installment Loan, even after PAFCU received notice of all of Plaintiff's disputes.

87.     Because PAFCU furnished inaccurate and derogatory information to Trans Union, and then chose not to correct the inaccurate information it was furnishing despite receiving notice of several disputes from Plaintiff, Trans Union continued to report the inaccurate and derogatory information on Plaintiff's credit.

**H.      Recent Publication of Inaccurate Information on Plaintiff's Credit File**

88.     On or about November 23, 2020, Plaintiff applied for credit, in the form of an Apple Card, with Goldman Sachs Bank. The credit transaction did not involve a principal amount of $150,000.00 or more. In connection with Plaintiff's credit application, Trans Union furnished to Goldman Sachs Bank a consumer report concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account.

89.     On or about March 29, 2021, in connection with her request to finance the purchase of a used 2017 Lexus RX350, Plaintiff submitted a credit application to the finance department at Pohanka Lexus, located in Chantilly, Virginia. The credit transaction did not involve a principal amount of $150,000.00 or more. In connection with Plaintiff's credit

application, Trans Union furnished to Pohanka Lexus a consumer report concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account.

90.     On or about April 4, 2021, Plaintiff applied for credit, in the form of a PayPal credit account, with Synchrony Bank. The credit transaction did not involve a principal amount of $150,000.00 or more. In connection with Plaintiff's credit application, Trans Union furnished to Synchrony Bank a consumer report concerning Plaintiff, which contained inaccurate and derogatory information regarding the Installment Loan account.

91.     Through their violations of Plaintiff's rights under the FCRA, Trans Union and PAFCU have both caused damage to Plaintiff.

**V.**

**CLAIMS FOR RELIEF**

**COUNT ONE:**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681c(a) (TRANS UNION)**

92.     Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

93.     Trans Union has violated 15 U.S.C. § 1681c(a)(5) by generating and furnishing to third parties multiple consumer reports concerning Plaintiff, each of which included adverse information regarding Plaintiff's Installment Loan that antedated the respective consumer reports by more than seven years.

94.     Trans Union's violations of 15 U.S.C. § 1681c(a)(5) were not subject to any of the exemptions set forth under 15 U.S.C. § 1681c(b).

95.     As a result of Trans Union's violations of 15 U.S.C. § 1681c(a)(5), derogatory information regarding the Installment Loan was reported on Plaintiff's credit and published

multiple times to third parties more than seven years after the date the account first became delinquent and more than seven years after the date Plaintiff filed her bankruptcy petition.

96.     As a result of Trans Union's violations of 15 U.S.C. § 1681c(a)(5), Plaintiff suffered actual damages, including, but not limited to loss of credit, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

97.     The violations by Trans Union were willful, rendering Trans Union liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

98.     Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from Trans Union in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT TWO:
### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(a) (TRANS UNION)

99.     Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

100.     Trans Union has violated 15 U.S.C. § 1681e(a) by failing to establish or to follow reasonable procedures designed to avoid violations of 15 U.S.C. § 1681c in the preparation of the consumer reports concerning Plaintiff that it generated and furnished to third parties.

101.     As a result of Trans Union's violations of 15 U.S.C. § 1681e(a), inaccurate and derogatory information regarding the Installment Loan was reported on Plaintiff's credit and published multiple times to third parties more than seven years after the date the account first

became delinquent and more than seven years after the date Plaintiff filed her bankruptcy petition.

102.    As a result of Trans Union's violations of 15 U.S.C. § 1681e(a), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, travel costs, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

103.    The violations by Trans Union were willful, rendering Trans Union liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

104.    Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from Trans Union in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT THREE:
### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b) (TRANS UNION)

105.    Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

106.    Trans Union has violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished and maintained concerning Plaintiff.

107.    As a result of Trans Union's violations of 15 U.S.C. § 1681e(b), derogatory information regarding the Installment Loan, with no indication of the date of first delinquency, continued to be reported on Plaintiff's credit and was published to third parties more than seven

years after the date the account first became delinquent and more than seven years after the date Plaintiff filed her bankruptcy petition.

108.     As a result of Trans Union's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, travel costs, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

109.     The violations by Trans Union were willful, rendering Trans Union liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, Trans Union was negligent, entitling Plaintiff to recovery under 15 U.S.C. § 1681o.

110.     Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from Trans Union in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n and § 1681o.

### COUNT FOUR:
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i(a) (TRANS UNION)

111.     Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

112.     After Plaintiff disputed the inaccurate information on her respective credit reports, Trans Union violated 15 U.S.C. § 1681i(a)(1) by failing to conduct reasonable reinvestigations to determine whether the disputed information was inaccurate and record the current status of the disputed information or delete the item from Plaintiff's credit file.

113.     After Plaintiff disputed the inaccurate information, Trans Union violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

114.    After Plaintiff disputed the inaccurate information, Trans Union violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the items of information upon a lawful reinvestigation.

115.    As a result of Trans Union's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, travel costs, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

116.    The violations by Trans Union were willful, rendering Trans Union liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative Trans Union was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

117.    Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## COUNT FIVE:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681s-2(b)(1) (PAFCU)

118.    Plaintiff realleges and incorporates all other factual allegations set forth in this complaint.

119.    On one or more occasions within the past two years, by example only and without limitation, PAFCU violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully and properly investigate Plaintiff's disputes.

120.    On one or more occasions within the past two years, by example only and without limitation, PAFCU violated 15 U.S.C. § 1681s-2(b)(1)(B) by failing to review all relevant information provided by Trans Union.

121.    On one or more occasions within the past two years, by example only and without limitation, PAFCU violated the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(1)(E), by failing to modify the representations about PAFCU accounts within Plaintiff's credit files with Trans Union, causing derogatory information to be reported for more than seven years after the date the account first became delinquent and more than seven years after the Plaintiff filed her bankruptcy petition.

122.    The law in this District, the Fourth Circuit, and even nationally was long ago articulated to require a detailed and searching reinvestigation by a creditor when it receives a consumer's FCRA dispute through a CRA. See *Johnson v. MBNA*, 357 F.3d 426 (4th Cir. 2004).

123.    PAFCU was aware of the *Johnson v. MBNA* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding Plaintiff's disputes.

124.    PAFCU understood the nature of Plaintiff's disputes when it received them from Trans Union.

125.    Upon information and belief, the procedures that PAFCU's employee(s) or agent(s) followed regarding Plaintiff's FCRA disputes through e-Oscar were the procedures that PAFCU intended its employees or agents to follow.

126.    Upon information and belief, PAFCU's employee(s) or agent(s) did not make a mistake in the way in which they followed PAFCU's procedures when they received, processed, and responded to the respective ACDV's from Trans Union.

127.    As a result of PAFCU's violations of 15 U.S.C. § 1681s-2(b)(1), derogatory information regarding the Installment Loan continued to be reported on Plaintiff's credit more than seven years after the date the account first became delinquent and more than seven years after the date Plaintiff filed her bankruptcy petition.

128.    As a result of PAFCU's violations of 15 U.S.C. § 1681s-2(b)(1), Plaintiff suffered actual damages, including, but not limited to loss of credit, postage costs, travel costs, damage to reputation, embarrassment, humiliation, and other emotional and mental distress.

129.    The violations by PAFCU were willful, rendering PAFCU liable for punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. In the alternative, PAFCU was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

130.    Plaintiff is entitled to recover actual damages, punitive damages, costs, and attorney's fees from PAFCU in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n and § 1681o.

## VI.

### DEMAND FOR RELIEF

Plaintiff therefore respectfully requests that this Court:

(1)    Award Plaintiff actual and punitive damages for violations of the FCRA by Trans Union and PAFCU;

(2)    Award Plaintiff attorney's fees and costs under the FCRA;

(3)    Award Plaintiff pre-judgment and post-judgment interest at the legal rate; and

(4)    Award other relief as the Court deems appropriate.

**TRIAL BY JURY IS DEMANDED**.

**ERICA LAVON CLARK**

By:

/s/ Mark C. Leffler
Emily Connor Kennedy, VSB# 83889
Mark C. Leffler, VSB# 40712
Stephen F. Relyea, VSB# 77236
Boleman Law Firm, P.C.
2104 W. Laburnum Ave, Suite 201
Richmond, VA 23227
(804) 358-9900 – Telephone
(804) 358-8704 – Facsimile
Email: eckennedy@bolemanlaw.com
Email: mcleffler@bolemanlaw.com
Email: sfrelyea@bolemanlaw.com

*Counsel for Plaintiff*